# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

No. 23-0238V

| | |
|---|---|
| LEE YUILL,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: July 31, 2025 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT[1]

On February 17, 2023, Lee Yuill filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). ECF No. 1. Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine received on October 14, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner more likely than not received the flu vaccine in his left arm, and more likely than not suffered the residual effects of his

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

alleged vaccine-related injury for more than six months. Therefore, and because Respondent does not contest the other requirements of a Table SIRVA claim, Petitioner is entitled to compensation under the Vaccine Act.

## I.     Relevant Procedural History

On December 20, 2023, just over 10 months after the case was initiated, Respondent his Rule 4(c) Report in which he argued that, based on the medical records, Petitioner had not provided sufficient evidence that the residual effects of that injury lasted for at least six months. ECF No. 18.

On February 9, 2024, Petitioner filed a motion for a Ruling on the Record Regarding Entitlement ("Mot."). ECF No. 19. Respondent filed a response ("Resp.") on March 25, 2024, in which he reiterates his previous argument that Petitioner has not satisfied the statutory severity requirement and also added, for the first time, an argument regarding the site of vaccination. ECF No. 22. The matter is now ripe for adjudication.

## II.    Factual History

Petitioner received a flu vaccine on October 14, 2020, at his employer's facility in Alabama. Ex. 1 at 3. The administration record does not indicate the site of vaccination. *Id*. About two weeks later, Petitioner visited a new primary care provider ("PCP") on October 29, 2020. Ex. 8 at 23. The record indicates that Petitioner declined a flu shot because he had already received one for that season. *Id*. He also reported that his left arm was sore. *Id*. at 24.

On December 1, 2020, Petitioner had email correspondence with the director of employee health at Huntsville Hospital. Ex 3. Petitioner stated that he received a "flu shot back on Oct 14 th (sic)" and that he was "still experiencing some arm pain in [his] left arm bicep area where the shot was given." *Id.* at 2. Petitioner saw an employee health physician two days later with complaints of "normal pain after [the] shot," that "never went away." Ex. 4 at 4. He was referred to physical therapy. *Id*.

Petitioner began physical therapy on December 15, 2020. Ex. 5 at 18. He reported that he "received a flu shot (10/14/20) in his left shoulder and has been experiencing pain ever since." *Id*. He had a total of seven physical therapy treatments through January 5. 2021. *Id*. at 4-14. Upon discharge, Petitioner had met his therapy goals and reported that his "pain from the flu shot had mostly resolved," but he continued to have soreness in the shoulder and his mobility was "improving." *Id*. at 14, 17. He was given a home exercise plan. *Id*. at 14.

Petitioner stated that after finishing physical therapy, he continued to self-treat his shoulder pain with ice, heat, compression sleeves, stretches and exercises, a massage

gun, CBD cream, kinesiology tape, and over-the-counter medications, which provided temporary relief. Ex. 11 at ¶5. He recalled pain continuing to wake him from sleep, but that certain events during the spring of 2021 prevented him from prioritizing medical treatment. *Id*. at ¶6-7. Petitioner noted work obligations in January 2021, home building beginning in February 2021, and a serious car accident involving his wife in April 2021. *Id*. at ¶7.

Petitioner returned to employee health on July 14, 2021 – approximately six months after his previous treatment. Ex. 4 at 7. He reported pain and weakness in his left upper arm "from the site of his flu shot last November." *Id*. No physical examination was noted in the record, and he was referred to a neurologist. *Id*.

Petitioner saw a neurologist on July 29, 2021. Ex. 6 at 10. He reported that "within the first few days" after his "flu vaccination in his left deltoid" he had muscle tenderness that was aggravated by movement. *Id*. He reported constant, moderate pain that worsened with movement. *Id*. On exam, he had "some limited range of motion," but had "both proximal and distal strength intact." *Id*. at 13. He also had some findings suggestive of cervical pathology or possibly cardiac causes. *Id*. A cervical MRI and EMG were ordered, and a cardiology evaluation recommended. *Id*. The MRI revealed "multilevel degenerative changes, most significant at C6-7 where there is moderate right and mild to moderate left neuroforaminal narrowing." *Id,* at 3-4. The EMG was normal. *Id.* at 9.

On September 15, 2021, Petitioner returned to employee health for further treatment for his "persistent" left shoulder pain. Ex. 4 at 10. He stated "that this all started after receiving the flu vaccine." *Id*. The doctor noted that although his MRI showed some degenerative changes, the doctor felt this was "not a good explanation for his pain." *Id*. She noted that his pain "is very specially L lower deltoid and some pain at his lower bicep region," and referred Petitioner to an orthopedist. *Id*.

Petitioner saw an orthopedic surgeon the following day. Ex. 7 at 29. He reported shoulder pain that "started after a flu shot was administered by a student on October 14, 2020." *Id*. He was diagnosed with impingement and adhesive capsulitis and sent for an MRI, which revealed a "partial thickness interstitial tear of the supraspinatus, a tear of the posterosuperior and inferior labrum, and tendinosis of the infraspinatus." *Id.* at 30-31, 40-41. Petitioner returned on October 1, 2021 for a follow-up visit, during which he was given a steroid injection and referred back to physical therapy. *Id*. at 26-27.

Petitioner returned to physical therapy for an evaluation on October 6, 2021. Ex. 7 at 104. He reported that "he had the flu shot and then his shoulder began to have some pain." *Id.* He completed a total of ten physical therapy sessions through November 23, 2021 and was discharged to a home exercise program. *Id.* at 75 – 103. Upon discharge, the therapist noted that Petitioner was "moving well overall and is functional". *Id.* at 75.

Petitioner continued to treat his left shoulder pain, including with surgery, through mid-2022.

### III. Applicable Legal Standards

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later

4

testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV. Finding of Fact

### A. Situs of Vaccination

Although Petitioner's vaccination record is silent as to the administration situs, he was consistent in attributing his shoulder pain to his vaccination whenever he obtained treatment. With his first communication to his employer regarding this shoulder pain, Petitioner attributed pain in his left arm to his vaccination.[3] *See* Ex. 3. Petitioner continued to link his shoulder pain to the vaccination throughout the remainder of his treatment, including with an employee health physician, two physical therapists, and an orthopedic surgeon. *See e.g.,* Ex. 4 at 4; Ex. 5 at 18; Ex. 6 at 10; Ex. 7 at 29. Petitioner never complained of, or received treatment for, *right* shoulder pain.

Given that the initial vaccine administration record is silent on the issue of situs, this is not a case where a testimonial assertion on the disputed fact seeks to vary or

---

[3] Petitioner also mentioned both his flu shot and left arm pain to his PCP during a visit only 15 days after vaccination, but the record is not clear exactly what he reported. Although not sufficiently specific, this record does not contradict Petitioner's allegation of administration in the left arm. *See* Ex. 8 at 23-24.

5

negate a record's content. Thus, though it is well-settled that "oral testimony *in conflict with* contemporaneous documentary evidence deserves little weight," such testimony can be credited where it provides detail that the record omits. *Kirby*, 997 F.3d at 1383 (emphasis added). Here, Petitioner's statements about the vaccination do not conflict with the vaccine administration record, but provide information that was not recorded at the time of the vaccine or for which other documentary evidence is not available. And otherwise there is no evidence in the record that Petitioner received the vaccine in his *right* arm.

I therefore find it more likely than not that the vaccine alleged as causal in this case was administered to Petitioner in the left shoulder on October 14, 2020.

### B. Severity

To satisfy the statutory severity requirement, Petitioner must demonstrate that his symptoms more likely than not continued until at least April 14, 2021 (six months from the October vaccination). There is no dispute that Petitioner sought treatment for his left shoulder pain through the end of his first course of physical therapy on January 6, 2021 – and then did not seek further treatment until July 14, 2021, six months later. Mot. at 2-3; Resp. at 2-3. Respondent argues that Petitioner reported that his pain was "mostly resolved" at the end of his initial physical therapy treatment and was able to perform his activities of daily living at the time – suggesting that his future complaints were not related to his flu vaccination. Resp. at 5-6. He further argues that concerns during Petitioner's later treatment for cervical issues also suggests that his return to treatment was not related to his initial injury – and thus fails to satisfy the six-month severity requirement. *Id*. at 6-7.

Although Petitioner did not seek treatment for a six-month period that overlaps with the six-month severity date, there is evidence that preponderates in favor of severity being met. First, when Petitioner returned to treatment in July 2021, he directly related his pain back to his prior vaccination, and he continued to do so throughout his ongoing treatment. Ex. 4 at 7; *See also* Ex. 5 at 18; Ex. 6 at 10; Ex. 7 at 29. Further, Petitioner continue to have some shoulder symptoms at the end of his first physical therapy treatment – including soreness, tightness, and limited mobility – even though his symptoms were much improved. *See* Ex. 5 at 14, 17. There is no evidence that Petitioner's shoulder symptoms have fully resolved prior to the gap in treatment.

In addition, Petitioner stated in his declaration that he continued to treat ongoing symptoms at home during the gap in formal treatment, utilizing ice, heat, compression sleeves, stretches and exercises, a massage gun, CBD cream, kinesiology tape, and over-the-counter medications, which provided only temporary relief. Ex. 11 at ¶5. And Petitioner has provided a reasonable explanation for why he did not return to formal

treatment, even though he continued to have shoulder pain. Specifically, Petitioner noted three life events that "pushed [his] shoulder symptoms to the bottom of [his] priority list" during the gap in treatment: work recruitment requirements, building a home, and a serious car accident involving his wife. *Id*. at ¶7.

Respondent's next argument – that the fact that Petitioner received neurological testing and investigation of cervical symptoms, which severed any connection to his vaccination – is likewise unpersuasive. First, Petitioners often undergo neurological testing during SIRVA treatment – but Petitioner's EMG was negative (and thus unsupportive of an alternative explanation for his complaints). *See* Ex. 6 at 9. Further, even though some degenerative findings were revealed in Petitioner's cervical MRI at the time, his doctors felt that those findings were "not a good explanation for his pain," and continued to offer targeted orthopedic care for his shoulder pain, including a shoulder MRI, additional physical therapy, steroid injections, and surgery. *See* Ex. 4 at 10; Ex. 7. The fact that Petitioner was later (long after his shoulder surgery) diagnosed with a cervical condition, as Respondent notes, does not negate the fact that he more likely than not suffered from his left shoulder pain for more than six months after his vaccination.

Thus, after consideration of the entire record, which includes both medical records and witness testimony, I find that Petitioner has provided preponderant evidence that the residual effects of his vaccine-related injury lasted for at least six months.

## V.     Ruling on Entitlement

### a. Requirements for Table SIRVA

Other than the argument above regarding the site of vaccination, Respondent has not contested Petitioner's proof on the specific elements of a Table SIVRA. In light of Respondent's position and the evidence of record, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury.

### b. Additional Requirements for Entitlement

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received his vaccination on October 14, 2020 in Alabama. Ex. 1 at 3; Section 11(c)(1)(A) (requiring receipt of a covered vaccine);

7

Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that he has not filed any civil action or received any compensation for his vaccine-related injury, and there is no evidence to the contrary. Ex. 11 at ¶8; *See* Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I find that the severity requirement has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master